# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————

Nº 08-CV-4119 (JFB) (WDW)

———————————

## PAUL CASSEUS,

Plaintiff,

VERSUS

## VERIZON NEW YORK, INC.,

Defendant.

———————————

**MEMORANDUM AND ORDER**
July 9, 2010

———————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Paul Casseus ("Casseus" or "plaintiff") brings this case against his former employer, Verizon New York, Inc. ("Verizon" or "defendant") alleging violations of the Family and Medical Leave Act, the Americans with Disabilities Act, Title VII of the 1964 Civil Rights Act, and the New York State Human Rights Law.  In November 2006, while employed with Verizon, Casseus requested leave to treat ulcers and wounds on his feet and ankles that resulted from sickle cell anemia.  Verizon granted the leave but subsequently obtained video footage of Casseus engaging in activities during his leave that, it claims, were inconsistent with representations Casseus and his doctor made regarding Casseus's health status.  After reviewing the video, Verizon told Casseus,

who was still on leave, that if he did not return to work he would face "separation from payroll."  Ultimately, Verizon fired Casseus based on his alleged misrepresentation of health status.

Before the Court are the parties' cross-motions for summary judgment. As set forth below, the Court denies plaintiff's motion for summary judgment in its entirety and grants defendant's motion in part and denies it in part.  First, plaintiff alleges that Verizon interfered with his rights under the Family and Medical Leave Act ("FMLA") and retaliated against him for exercising those rights. Verizon argues that it is entitled to summary judgment on plaintiff's FMLA claims because it honestly believed that plaintiff had misrepresented his health status.  After reviewing the record, and construing the

evidence in the light most favorable to the party opposing summary judgment under the summary judgment standard, the Court concludes that there are genuine issues of fact that preclude summary judgment for either side on the FMLA claims.

Second, plaintiff alleges that Verizon discriminated against him on the basis of race in violation of Title VII of 1964 Civil Rights Act and the New York State Human Rights Law ("NYSHRL"). However, no reasonable jury would find that plaintiff has established even a prima facie case of racial discrimination. To the extent that plaintiff makes new allegations in a memorandum of law on the pending motions regarding racial discrimination, the Court rejects those allegations as procedurally and substantively defective. Accordingly, the Court grants defendant summary judgment on the race discrimination claims.

Third, plaintiff brings a claim for disability discrimination under the Americans with Disabilities Act and the NYSHRL. Plaintiff cannot establish a prima facie case of disability discrimination under the ADA because, even accepting his medical evidence as true and construing such evidence in the light most favorable to him, he cannot establish that the episodic manifestations of his sickle cell anemia substantially limit him in any major life activity within the meaning of the ADA under the particular circumstances of this case. Thus, the Court grants defendant summary judgment on the ADA claim and denies plaintiff summary judgment on that claim. However, the NYSHRL's definition of disability is broader than the ADA's, and a reasonable jury could find that plaintiff's condition comes with that definition. Additionally, there are triable issues of fact on

the remaining elements of plaintiff's NYSHRL disability discrimination claim, and, therefore, the Court denies the cross-motions for summary judgment on this claim.

## I. Background

The following facts are taken from the parties' depositions, declarations, exhibits, and respective Local Rule 56.1 statements of facts.[1]

### A. Casseus's Employment

Casseus worked for Verizon as a customer service representative ("CSR") from January 2000 until June 2007. (Def.'s 56.1 ¶¶ 1, 37.) CSRs sit at a work station and, while wearing a headset, answer calls from customers. (*Id*. ¶ 2.) Casseus concedes that his job was primarily sedentary but also claims that he had to walk away from his desk and travel up or down stairs so that he could attend meetings and training. (*See id*.; Pl.'s Opp. 56.1 ¶ 2.) At all relevant times, Casseus worked in Verizon's Wantagh, New York facility. (Def.'s 56.1 ¶ 1.)

### B. Casseus's Sickle Cell Anemia

For most of his life, Casseus has suffered from sickle cell anemia. One symptom of

---

[1] Where one party's Local Rule 56.1 statement is cited, the fact is not contested by the other party. Because both parties moved for summary judgment, four Local Rule 56.1 statements were submitted. Verizon's statement in support of its motion will be cited as "Def.'s 56.1"; plaintiff's statement in opposition to Verizon's motion will be cited as "Pl.'s Opp. 56.1"; plaintiff's statement in support of his motion will be cited as "Pl.'s 56.1"; and Verizon's opposition statement will be cited as "Def.'s Opp. 56.1."

Casseus's sickle cell anemia is that Casseus periodically experiences "vascular crises" in which ulcers and wounds develop on his lower extremities. When these ulcers and wounds develop, they drain and emit a foul odor. Casseus and his doctors treat the wounds through "serial debridement" and "advanced wound therapy." (*See* Pl.'s 56.1 ¶ 7-10.)[2] Between 2000 and 2006, Casseus had two such vascular crises. (Rainsford Decl. ¶ 19.)

### C. Casseus Requests Leave and Verizon Begins Surveillance

On November 27, 2006, Casseus told Eileen Capriotti, an Absence Administrator at the Wantagh facility, that he had to be absent from work because he was having trouble with his foot and ankle. (Def.'s 56.1 ¶ 4.) Almost immediately, Capriotti notified John Scuteri, the supervisor of the Wantagh facility, of Casseus's leave request and suggested that Verizon begin surveillance on Casseus. According to Capriotti, she requested surveillance because Casseus had taken leave during the same time of year in 2002, four years prior, and thus she suspected that Casseus could be fraudulently requesting leave. (Def.'s 56.1 ¶ 10; Pl.'s Opp. 56.1 ¶ 10.) Surveillance began on November 30, 2006. (*See* Brener Decl. Ex. N.)

Under Verizon policy, Casseus was required to submit to Verizon an "FMLA Certification Form." (Def.'s 56.1 ¶ 5.) The form is completed partially by the employee and partially by the employee's treating physician. (*See* Brener Decl. Ex. H.) Casseus and his treating physician, Dr. Alan Cantor, submitted an FMLA Certification Form on or about December 4, 2006. (*See id*.) The form stated that Casseus was suffering from "chronic and acute lower extremity-ankle-foot ulcerations wound infections due to sickle cell disease." (*Id*.) The form also indicates that Casseus's condition made him unable to perform at least one of the essential functions of his job and "closed shoe gear [was] not tolerated due [to] pressure on existing ulcerations [of] L and R ankles. Needs rest." (*Id*.) Furthermore, the form states that Casseus would be absent until approximately February 1, 2007. Both Casseus and Cantor signed the form. (*Id*.) Based on this submission, Verizon granted Casseus FMLA leave for the period between November 27, 2006 and February 1, 2007. (Def.'s 56.1 ¶ 7.)

Sometime in December, Verizon officially approved Casseus for leave under the Family and Medical Leave Act. When it approved Verizon for FMLA leave, Verizon's FMLA department had information in its records that Casseus suffered from sickle cell anemia and ankle ulcers. (*See* Pl.'s 56.1 ¶ 11.) Verizon contends, however, that neither Capriotti, Scuteri, nor Joann Henke, a Verizon director and the official who, Verizon asserts, ultimately fired Casseus, were aware that Casseus had sickle cell anemia. (Def.'s Opp. 56.1 ¶ 12.) Casseus's leave was to run until February 1, 2007. (Pl's 56.1 ¶ 14.)

### D. Doctor's Certification

Verizon contracts with MetLife to administer its employees' medical and disability leaves. (Def.'s 56.1 ¶ 3.) On December 11, 2006, Casseus's doctor, Dr. Cantor, faxed MetLife a form called the

---

[2] Defendant argues these facts are not material to the pending motions. (*See* Def.'s Opp. 56.1 ¶¶ 7-10.) However, it submits no evidence to controvert these facts.

"Attending Physician[']s Statement." (Brener Decl. Ex. J.) The form indicates that Casseus was able to sit continuously and was able to stand and walk for one hour at a time. However, the form also indicates that Casseus was unable to "[t]wist/bend/stoop" or to "[o]perate a motor vehicle" and that, in the doctor's opinion, Casseus was "totally disabled from performing any job, including but not limited to his/her current job." (Def.'s Ex. J.) Casseus did not sign this document, and the parties dispute whether Casseus ever saw it or knew about its contents. (Def.'s 56.1 ¶ 9; Pl.'s Opp. 56.1 ¶ 9.)

E. Capriotti Calls and Visits with Plaintiff

Verizon contacts employees who are out on leave. (Pl.'s 56.1 ¶ 22; Def.'s Opp. 56.1 ¶ 22.) During Casseus's leave, Verizon officials, including Capriotti, called plaintiff on several occasions and made an unannounced visit to Casseus's home on December 18, 2006. (Pl.'s 56.1 ¶¶ 26-28; Def's Opp. 56.1 ¶ 27.) Verizon asserts that, during the phone calls with plaintiff, Verizon officials discussed with Casseus the possibility of him coming back to work with "restrictions" and "accommodations."[3] Plaintiff indicated he needed to speak to his doctor. (See Def.'s 56.1 ¶ 15; Pl.'s Opp. 56.1 ¶ 15; Brener Decl. Ex. E.)

F. Video Surveillance of Plaintiff

As noted above, Verizon had attempted to conduct surveillance on Casseus beginning November 30. The surveillance team did not observe Casseus that day. Nor did it observe Casseus during approximately nine hours of surveillance of his home on December 12. (See Brener Decl. Ex. N.)

On December 19, 2006, however, the surveillance team observed Casseus standing and walking in the parking lot in front of his home for approximately 25 minutes. Casseus went back inside for a time and was then observed driving himself to two different banks over an approximately 45-minute period. At times, Casseus walked with a limp and sometimes carried a cane. (See id.) The surveillance team videotaped Casseus's activities. (See id. Ex. O.)

The next day, the surveillance team observed Casseus walk out of his home using a cane. He got into a car with an unidentified female. With Casseus driving, the car went to a nearby Burger King drive through and then traveled to Darien, Connecticut. In Darien, Casseus stopped at a Mobil station and used the self-service gas pump to fuel the vehicle. The car then traveled to Clinton, Connecticut where it stopped at the Clinton Crossing Premium Outlets. There, Casseus got out of the car with his female companion and, with a noticeable limp, walked from the parking lot to the stores. (See Brener Decl. Exs. N; O.) Again, the surveillance team obtained video of Casseus's activities. (See id. Ex. O.) At this point, the surveillance team lost sight of Casseus. When the team returned to the parking lot 13 minutes after Casseus had been seen entering the stores, Casseus's car was gone. (See Brener Decl. Ex. N.)

At his deposition, Casseus testified that the video taken by the surveillance team fairly and

---

[3] (Def.'s 56.1 ¶ 14; Pl.'s Opp. 56.1 ¶ 14; Pl.'s 56.1 ¶ 28.) Although plaintiff makes an unresponsive denial in opposition to paragraph 14 of defendant's Rule 56.1 statement, it appears, based on paragraph 28 of plaintiff's own Rule 56.1 statement, that there is no material dispute here.

accurately depicted his activities on December 19 and 20, 2006. (*See* Pl.'s Dep. 143:1-5.)

## G. MetLife Revokes Casseus's Disability Benefits

Subsequently, MetLife officials reviewed the video. On January 25, 2007, MetLife notified Casseus that based on the surveillance reports and video, "it appears that you are able to stand, walk, bend and drive for extended periods of time. Your Physician indicated that you were not to bend, stoop, lift, twist, bend, or drive. Although you were observed using your cane at times and did walk with a slight limp, it is apparent that you are able to function and perform the sedentary duties of your job." (Brener Decl. Ex. Q.) Accordingly, MetLife denied plaintiff's disability claim, retroactive to December 19, 2006. (*See* Def.'s 56.1 ¶ 19.)

After Verizon learned that MetLife had denied plaintiff disability benefits, it ordered Casseus to return to work by January 29, 2007 or face "separation from payroll." (Def.'s 56.1 ¶ 21.)[4]

## H. Casseus's Return to Work

Casseus returned to work on January 29,

2007. (Def.'s 56.1 ¶ 22; Pl.'s 56.1 ¶ 41.) On or about that date, Casseus gave Capriotti a note from Dr. Cantor stating that Casseus's return to work was against the doctor's recommendation. (Pl.'s 56.1 ¶ 41; Def.'s Opp. 56.1 ¶ 41.) Casseus took numerous vacation days in February and later began educational leave, mostly to complete his master's degree but also so that he could properly take care of his ankle wounds and ulcers, which were still extant. (Pl.'s Dep. 225:1-226:6; 228:4-15.)

Verizon subsequently prepared an "Investigative Report" on Casseus's FMLA leave. The report noted a finding by MetLife's medical director that the video surveillance demonstrated that Casseus was capable of performing his job. Furthermore, the report stated that Casseus had told Verizon investigators that he had performed the activities depicted on the video surveillance and had traveled to his wife's family's house in Connecticut. (*See* Brener Decl. Ex. P.)

## I. The Third Party Medical Opinion

The Collective Bargaining Agreement between Verizon and the Communications Workers of America allows an employee to request a third-party medical opinion ("TMO") when there is a difference of opinion between MetLife and an employee's physician. (Def.'s 56.1 ¶ 27.) On March 5, 2007, plaintiff requested a TMO through his union. (*Id.* ¶ 28.) A Verizon vendor selected Dr. Jay Abeles to examine Casseus. Abeles examined Casseus on March 29, 2007 and subsequently prepared a report. (*Id.* ¶ 29; Pl.'s Opp. 56.1 ¶ 29; Pl.'s 56.1 ¶ 44.)

The report was addressed to Ana Melo-Papadakis, an official in Verizon's Labor

---

[4] Paragraph 21 of plaintiff's opposition Rule 56.1 statement denies the cited assertion. Plaintiff does not explain the denial but simply cites to an exhibit. However, the exhibit cited by plaintiff is the exact same letter defendant cites to support the assertion that plaintiff was ordered back to work. Thus, despite plaintiff's denial, there is no factual dispute regarding the fact that Verizon ordered plaintiff back to work after it learned MetLife had denied his disability benefits.

Relations Department. The report notes that plaintiff had ulcers on both ankles which were draining and had a foul odor. After reviewing medical records and the records of the surveillance on Casseus though, Dr. Abeles concluded that when Casseus was observed on December 19, 2006, he "should have been able to perform a sedentary job." (Brener Decl. Ex. X.) As discussed *infra*, however, Dr. Abeles changed his opinion at his deposition in this case.

## J. Verizon Terminates Casseus

Verizon's disciplinary committee, which was made up of members of Verizon's Labor Relations Department,[5] along with Scuteri, the supervisor of the Wantagh facility, and Henke, the director, then reviewed the "Investigative Report" and the surveillance video. According to their deposition testimony, Scuteri and Henke were aware of Dr. Abeles's recommendation but only the members of the Labor Relations Department had Abeles's actual report on Casseus's condition. Thus, according to Scuteri and Henke, they knew Dr. Abeles had found Casseus was able to work but did not know anything about Casseus's underlying medical condition. (*See* Scuteri Dep. 55:8-12, 62:9-17, 67:1-7; Henke Dep. 24:20-25.) Ultimately, it was decided that Casseus should be fired. (*See* Henke Dep. 14:13-23; Scuteri Dep. 52:20-23.) Capriotti and Scuteri met with Casseus on June 1, 2007 and terminated him. (Def's. 56.1 ¶ 37.)[6]

---

[5] (Henke Dep. 10:16-18.)

[6] Although plaintiff's opposition 56.1 statement denies this assertion with a conclusory, non-responsive denial, he submits no evidence to controvert this fact.

## K. Procedural History

Plaintiff filed the complaint in this action on October 8, 2008. After Verizon answered, the parties spent much of 2009 in discovery. In December 2009, the parties advised the Court that they each intended to move for summary judgment. Following a pre-motion conference on January 7, 2010, the parties filed cross motions for summary judgment on February 26, 2010. After the motions were fully submitted, the Court heard oral argument on June 23, 2010.

## II. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 104 (2d Cir. 2010). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (emphasis in original)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

The Second Circuit has provided additional guidance regarding summary judgment motions in discrimination cases:

We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g.*, *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)).

### III. DISCUSSION

Plaintiff alleges that (1) Verizon interfered with his rights under the Family and Medical Leave Act ("FMLA") and retaliated against him for exercising those rights; (2) discriminated against him on the basis of race in violation of Title VII and the New York State Human Rights Law ("NYSHRL"); and (3) discriminated against him on the basis of disability in violation of the Americans with Disabilities Act and the NYSHRL. As set forth below, the Court denies both parties' motions for summary judgment on the FMLA claims and the NYSHRL disability discrimination claim. However, the Court grants defendant summary judgment on the race discrimination claims and the ADA disability discrimination claim.

## A. FMLA Claim

The FMLA gives eligible employees an "entitlement" to twelve weeks of unpaid leave each year based on "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D); *see also Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006). There are two ways in which an employer can violate the FMLA. First, it is unlawful for an employer to retaliate against an employee because the employee exercised his FMLA rights. *Potenza v. City of N.Y.*, 365 F.3d 165, 167-68 (2d Cir. 2004). Second, it is unlawful for an employer to "interfere with, restrain, or deny the exercise of" an employee's FMLA rights. 29 U.S.C. § 2615(a)(1); *see also DiGiovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 199 (S.D.N.Y. 2009). Here, plaintiff brings claims under both the "retaliation" and "interference" theories of FMLA liability.

### 1. Standard

### (a) FMLA Retaliation Claims

With respect to FMLA retaliation claims, the burden-shifting approach originally set out by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), applies. *See Potenza*, 365 F.3d at 168. Thus, to state a prima facie case of FMLA retaliation, the plaintiff must show that (1) he exercised rights protected under the FMLA; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. *Id.* If the plaintiff establishes a prima facie case, then the burden

of production shifts to the employer to demonstrate a legitimate, non-discriminatory reason for the adverse employment action. *DiGiovanna*, 651 F. Supp. 2d at 203. If the employer meets its burden of production, then the plaintiff must establish that the employer's proffered reason was merely a pretext for a discriminatory reason. *See id.* at 203-04.

### (b) FMLA Interference Claims

To state a prima facie case for interference with FMLA rights, the plaintiff must establish (1) that he is an eligible employee under the FMLA; (2) that defendant is an employer under the FMLA; (3) that he was entitled to FMLA leave; (4) that he gave notice to defendant of his intention to take leave; and (5) that the defendant denied or otherwise interfered with benefits to which the employee was entitled under the FMLA. *See Garraway v. Solomon R. Guggenheim Found.*, 415 F. Supp. 2d 377, 382 (S.D.N.Y. 2006); *accord Divers v. Metro. Jewish Health Sys.*, No. 06-CV-6704(RRM)(JMA), 2009 WL 103703, at *20 (E.D.N.Y. Jan. 14, 2009). Interference with FMLA rights can include "'not only refusing to authorize FMLA leave, but discouraging an employee from using such leave . . . .'" *Potenza*, 365 F.3d at 167 (citing 29 C.F.R. § 825.220(b)).

With respect to the interference claim, Verizon asserts that the claim cannot survive summary judgment because Verizon had a good faith belief that plaintiff misrepresented his health status which, it argues, provides a complete defense to an FMLA interference claim. (*See* Def.'s Mem. of Law at 23.) It is axiomatic that an interference claim can be defeated by showing that the employee did not take the leave for its intended purpose and thereby abused the leave. Such an employee

is ineligible for leave under the FMLA. *See Vail v. Raybestos Prods. Co.*, 533 F.3d 904, 909 (7th Cir. 2008). Numerous courts have extended this rule to conclude that an employer's honest belief that an employee is abusing FMLA leave defeats an FMLA claim, even if that belief is mistaken. *See, e.g., id.* (Stating that, with respect to an FMLA interference claim, "an employer has not violated the FMLA if it refused to reinstate the employee based on an 'honest suspicion' that she was abusing her leave" (citation omitted)); *Medley v. Polk Co.*, 260 F.3d 1202, 1207 (10th Cir. 2001) ("The law, from a number of authorities at both the federal appellate and district court levels, is, however, uncontradictedly being pronounced that an employer honestly believing that the employee has abandoned her job and is otherwise not using FMLA leave for its here 'intended purpose', to care for a parent, would not be in violation of [the] FMLA, even if its conclusion is mistaken, since this would not be a discriminatory firing." (footnote and citation omitted)); *Reinwald v. The Huntington Nat'l Bank*, 684 F. Supp. 2d 975, 984-85 (S.D. Ohio 2010) ("The honest belief defense applies to both interference and retaliation claims brought under the FMLA." (citations omitted)); *Nelson v. Oshkosh Truck Corp.*, No. 07-C-509, 2008 WL 4379557, at *4 (E.D. Wis. Sept. 23, 2008) ("[I]n order to defeat an FMLA interference claim, the employer 'need not conclusively prove that [the employee] had misused her leave; an honest suspicion will do.'" (quoting *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 681 (7th Cir. 1997))); *accord Jackson v. Jernberg Indus. Inc.*, 677 F. Supp. 2d 1042, 1052 (N.D. Ill. 2010).

The Second Circuit has not addressed the "honest belief" defense in the context of FMLA interference claims and has not decided whether the *McDonnell-Douglas* burden-shifting approach should be applied not only to FMLA retaliation claims, but also to FMLA interference claims. *See Potenza*, 365 F.3d at 168 (discussing case authority from other circuits but declining to decide the issue); *see also Sista*, 445 F.3d at 176 (noting the issue identified in *Potenza* and concluding, without reference to the *McDonnell-Douglas* test, that summary judgment was warranted for employer on both FMLA interference and retaliation claims because there was no dispute that employer could fire plaintiff for threatening a supervisor and no evidence that the FMLA leave was a negative factor in decision to terminate plaintiff). However, in the context of this case, the Court will assume *arguendo*, as urged by defendant, that an employer can defeat an FMLA interference claim by establishing that it had a legitimate, non-discriminatory reason for its actions, even if that reason was mistaken. As set forth below, however, there are disputed issues of fact that preclude summary judgment in either party's favor on the FMLA interference and retaliation claims.

### 2. Application

#### a. Defendant's Motion

Verizon does not appear to seriously argue that plaintiff cannot establish a prima facie case of FMLA interference or FMLA retaliation.[7] In any event, based upon the

---

[7] The only argument Verizon makes regarding a prima facie case on either FMLA theory is a footnote in its moving brief. The footnote asserts that plaintiff cannot establish a prima facie case on his FMLA retaliation claim because six months passed from the time plaintiff took leave until Verizon fired him, and this passage of time obviates any casual connection between the

evidence discussed *infra* in connection with the ultimate issue, the Court concludes that plaintiff has established a prima facie case. The focus of Verizon's argument on the FMLA claims is that Casseus misrepresented his health status, and, therefore, it had a legitimate, non-discriminatory reason for its actions regarding plaintiff. (*See* Def.'s Mem. of Law at 22-23.) However, viewing the evidence in a light most favorable to the plaintiff, there are genuine issues of disputed fact on the following issues that preclude summary judgment for the defendant: (1) whether defendant believed in good faith that plaintiff had misrepresented his health status in a material manner and, thus, abused the leave; (2) whether defendant interfered with plaintiff's leave under FMLA by overly scrutinizing him while on leave and then seeking to terminate the leave based on a pretextual claim by that he had misrepresented

his health status; and (3) whether Verizon claimed that plaintiff misrepresented his health status in terminating plaintiff as a pretext for retaliating against him for taking the FMLA leave.

Plaintiff relies on several different pieces of evidence in the record to raise genuine issues of fact on the FMLA interference and retaliation claims. First, plaintiff points to evidence that Capriotti (the Absence Administrator at the Wantagh facility) and Scuteri (the supervisor at the Wantagh facility) ordered surveillance—something they did relatively infrequently[8]—on plaintiff almost immediately after he submitted his leave request. Indeed, Verizon began surveillance on Casseus even before it had officially approved him for FMLA leave. Although Verizon asserts that it had detected a possible "pattern" of absence by plaintiff because plaintiff had requested leave during the same time of year four years before, a Verizon witness also indicated that a four-year gap is not typically indicative of a "pattern." (*See* Keating Dep. 9:23-11:25.) Second, plaintiff notes that Capriotti made a series of calls to plaintiff early on in his absence and made an unannounced visit to plaintiff's house before surveillance had revealed any basis for believing that plaintiff was abusing his leave. (*See* Brener Decl. Ex. E.) Third, even after he was ordered to return to work on January 29, 2007, plaintiff gave Capriotti a note from his doctor, stating that Casseus's return to work was against the doctor's recommendation. Fourth, there is evidence that Capriotti, after plaintiff was ordered back to work, refused to

---

protected activity and the alleged retaliatory act. The Court disagrees. Although courts have dismissed retaliation claims where more than two to three months have passed between the protected activity and the adverse employment action, this not a hard and fast rule, and courts have found an inference of causation where more time passed. *See, e.g.*, *McGuire v. Warren*, No. 05 Civ. 02632 (DCP) (WCC), 2009 WL 3963941, at *13 (S.D.N.Y. Nov. 18, 2009) (finding that eight-month gap between protected activity and adverse employment action did not break casual connection and collecting cases); *see also Richardson v. N.Y.S. Dep't of Corr. Serv.*, 180 F.3d 426, 446-47 (2d Cir. 1999), *abrogated on other grounds*, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (holding abusive acts within one month of receipt of deposition notices may be retaliation for initiation of lawsuit more than one year earlier). Moreover, as set forth more fully below, activity was occurring with respect to Casseus, his leave, and his health status throughout the entire period at issue.

---

[8] (*See* Capriotti Dep. 28:25-29:3 (speculating that she "could have" requested surveillance 20 times in ten years).)

meet with plaintiff to discuss modified working conditions. (*See* Pl.'s Dep. 169:10-171:15.) Fifth, there is evidence that the Verizon officials involved in the decision to terminate Casseus gave at least somewhat inconsistent deposition testimony as to what exactly Casseus misrepresented about his health status.[9] Finally, plaintiff asserts that, under Verizon policy, repeated disabilities of long duration where health prospects are poor constitute an unsatisfactory attendance record. (*See* Pl.'s 56.1 ¶ 4.) In sum, there is sufficient evidence in the record, when viewed as a whole and in a light most favorable to plaintiff, to create genuine issues of disputed fact that preclude summary judgment on the FMLA interference and retaliation claims.

The Court has considered defendant's arguments in support of its motion for summary judgment on the FMLA claims, but finds those arguments to be unpersuasive. First, although Verizon suggests that plaintiff admitted misrepresenting his health status, the Court disagrees. In making this contention, Verizon relies in part on the "Attending Physician's Statement" form submitted by Dr. Cantor (*see* Brener Decl. Ex. J.) and on

Casseus's answers to questions about the form at his deposition. (*See* Def.'s Reply Mem. of Law at 5 n.8.) In filling out the form, Dr. Cantor indicated that plaintiff could sit "continuously" and could stand or walk for one to two hours at a time but could not "twist/bend/stoop," "reach above shoulder level," or "operate a motor vehicle." (*See id.*) At plaintiff's deposition, plaintiff agreed that he nonetheless drove, bent, and walked in the video. (Pl.'s Dep. 165:9-24.)

There is no evidence, however, that plaintiff knew in December 2006 what Dr. Cantor had said in the Attending Physician's Statement. (*See* Pl.'s Dep. 123:20-23.) Additionally, although plaintiff was seen walking in the video, the Attending Physician's Statement appears to indicate that plaintiff was capable of walking for one to two hours at a time. In short, there is no evidence Casseus—as opposed to his doctor—stated that he was unable to drive or bend.[10] Nor did plaintiff admit to Verizon investigators that he had misrepresented his health status. (*Cf.* Def.'s Reply Mem. of Law at 5.) In support of this assertion, defendant relies on language from a Verizon investigative report stating that "Casseus acknowledged he performed all of the activities that he was observed doing while surveillance was conducted on December 19,

---

[9] (*Compare* Papadakis Dep. 93:23-94:2 (stating that "the two reasons" plaintiff was terminated were "driving" and "bending") *and id.* 86:17-22 (agreeing that plaintiff "was not fired for walking in the video" or "standing in the video") *with* Henke Dep. 47:22-48:9 (stating that decision to fire Casseus was based on video of him "walking, standing, [and] driving to Connecticut" even though he claimed to be totally disabled); *and* Scuteri Dep. 58:24-59:1 (stating that he recommended plaintiff be terminated were because he could "walk" and "drive"); *and id.* 66:25 (stating that he recommended plaintiff be terminated because plaintiff could "[s]tand, sit, and walk").)

---

[10] Defendant similarly mischaracterizes other "admissions" by plaintiff. For example, defendant argues that, when plaintiff applied for unemployment benefits, he admitted that "he was terminated for 'violating a section of the employee handbook regarding disability.'" (Def.'s Mem. of Law at 11-12.) However, when plaintiff made this statement, he was answering a question that asked "[w]hat reasons *were you given by your employer* for being fired?" Clearly, this is a different question than "why were you fired?"

2006 and December 20, 2006. Casseus told Security that he went to his wife's family house in Connecticut[;] however he did not recall how long he was there." (Brener Decl. Ex. P.) Viewed in a light most favorable to plaintiff, this statement simply acknowledges that he was the person seen on the video.[11] In sum, the record contains no evidence that Casseus acknowledged fraudulently requesting leave; rather, the record reflects that Casseus, even after being ordered to return to work, maintained that his sickle cell anemia and ulcers made it difficult to get to work everyday and took vacation days to treat his wounds.[12]

Second, the medical evidence relied upon by Verizon does not compel summary judgment in its favor. In particular, to further support its argument that it had a good faith basis to terminate Casseus, Verizon relies on medical evidence that Casseus was able to perform his job despite his condition. (Def.'s Mem. of Law at 20; Def.'s Reply Mem. of

Law at 5.) As a threshold matter, Verizon's medical evidence directly conflicts with the note written by plaintiff's doctor stating that plaintiff's return to work was against doctor's orders. Furthermore, the MetLife Medical Director's conclusion appears to have been based solely on a review of the surveillance report and the surveillance video. (See Brener Decl. Ex. P.) Nothing in the record indicates that he knew of Casseus's underlying medical condition or medical history. Nor did the medical director ever examine Casseus. There are also questions regarding the weight that should be attached to Dr. Abeles's conclusion that plaintiff was able to work. For one, Dr. Abeles, a podiatrist, acknowledged at his deposition that, over a 20-year career, he had never treated anyone for sickle cell anemia, the condition suffered by plaintiff. (See Abeles Dep. 31:16-32:11.) Moreover, although Dr. Abeles concluded in 2007 that Casseus was able to perform his job, he changed his mind after researching sickle cell anemia during an overnight break in his deposition in this case. After researching sickle cell anemia, Abeles testified:

> [I]n his case, because he is on that medication hyrdoxyurea, obviously being on that, which is an anti-cancer drug[,] for severe crisis. If he is suffering from severe crisis, that is going to effect his work, again, at different times, different places. You can't really judge when he is going to have it. The surveillance, he could one minute be able to walk and do all activities and a couple of days later he could be hospitalized . . . . But obviously by being on that medication, he was pretty you know, he had pretty severe symptoms.

(Abeles Dep. 108:9-109:18.) Plaintiff's

---

[11] Notably, even with this "admission," the report's conclusion is that Casseus "*may* have violated" a section of Verizon's Code of Conduct prohibiting misrepresentations of health status. (Brener Decl. Ex. P (emphasis added).)

[12] (See Pl.'s Dep. 225:1-226:6; 228:4-15.) Thus, this case is factually distinguishable from *Roge v. NYP Holdings, Inc.*, 257 F.3d 164 (2d Cir. 2001), which defendants rely heavily on to support the proposition that an employer may terminate an employee who the employer in good faith believes engaged in fraud. 257 F.3d at 169. In *Roge*, however, the employee initially submitted a doctor's note stating that he was permanently disabled and then, after he became unhappy with his disability benefits, sought to have a doctor certify that he was able to work. This sequence of events was known to the employer. *See* 257 F.3d at 169.

counsel then asked Abeles if he had

> been asked the question back in 2007, not just can Mr. Casseus do his sedentary job, but can Mr. Casseus do all of these components that make up his workday and getting to and from his workday, would your opinion have been different, the same or can you comment now?

Abeles answered, "[b]ased on what I knew and what I was asked at that time, with those open ulcerations, my opinion would have changed." (Abeles Dep. 112:21-113:6.)

It is important to note that Verizon disavows any role in selecting Dr. Abeles or shaping his conclusion in 2007. Additionally, the Court recognizes that the decision makers at Verizon only had before them Dr. Abeles's original conclusion—namely, that plaintiff could work—when they fired plaintiff. However, the circumstances surrounding this examination and the information supplied to Dr. Abeles—including the fact that Abeles was not familiar with sickle cell anemia at the time he examined plaintiff, his 180 degree change in opinion during his deposition, the limited scope of the MetLife medical director's investigation, and the fact that Verizon concluded that Casseus had misrepresented his health status even though the relevant decision makers were unaware of a key fact regarding Casseus's health, i.e., that he had sickle cell anemia—create issues of disputed fact in light of the entire record regarding Verizon's precise role in Abeles's initial assessment and whether the proffered reason for terminating plaintiff was pretextual.

Finally, the surveillance video, which is Verizon's key piece of evidence in this lawsuit, does not support summary judgment in Verizon's favor in light of the entire record. First, the video covers a small part of Casseus's leave—roughly two two-hour periods during approximately 35 hours of surveillance on plaintiff's home. (*See* Brener Decl. Ex. N.) During the other periods of surveillance, plaintiff was not observed outside the home. (*See id*.) Additionally, although plaintiff is observed walking and standing in the video, the Attending Physician Statement indicated, as noted above, that he could walk and stand for between one and two hours at a time. Furthermore, although the Attending Physician Statement also indicated plaintiff was unable to drive or bend, again, there is no evidence plaintiff was aware that the Attending Physician Statement said this. Finally, aspects of the video are consistent with the representations made by plaintiff. For example, plaintiff is seen wearing—in December—flip flops and tube socks which is consistent with the statement in the FMLA Certification Form that "closed shoe gear non-tolerated." (*See* Brener Decl. Ex. H.) Additionally, plaintiff limps and uses a cane at points in the video. (*See id*. Ex. O.)

As noted earlier, numerous courts have held that an employer's belief that an employee engaged in misconduct need not be correct, only honestly held. *See, e.g.*, *Worster v. Carlson Wagonlit Travel*, No. 3:02-CV-167 EBB, 2005 WL 1595596, at *2 (D. Conn. July 6, 2005) ("[A]n employer who honestly believes that it is terminating an employee who obtained FMLA leave fraudulently will not be liable even if the employer is mistaken in its belief."); *LeBoeuf v. N.Y. Univ. Med. Ctr.*, No. 98 Civ. 0973 (JSM), 2000 WL 1863762, at *3 (S.D.N.Y. Dec. 20, 2000) ("Where an employee is terminated because the employer honestly believed that the employee was not using the leave period for its 'intended purpose,' an FMLA claim will

not lie."). In this case, however, viewing the record in a light most favorable to plaintiff, there are genuine issues of disputed fact that preclude summary judgment on the issue of whether Verizon acted in bad faith in interpreting plaintiff's actions (and his doctor's representations) and, accordingly, whether its proffered non-discriminatory reason should be rejected.

This Court's determination on this issue is consistent with decisions by courts in other jurisdictions analyzing FMLA claims. For example, in *Nelson v. Oshkosh Truck Corp.*, No. 07-C-509, 2008 WL 4379557, at *2-3 (E.D. Wis. Sept. 23, 2008), the employer terminated the plaintiff after reviewing surveillance video showing plaintiff driving her car and shopping on two different dates, which the employer viewed as inconsistent with her doctor's claim that she was unable to work. In denying the employer's motion for summary judgment, the court explained:

> It may be true that a jury will ultimately conclude that the decision to terminate [plaintiff's] employment was based on an honest suspicion that she was abusing her leave. But the evidence bearing on the issue is not so one-sided as to warrant summary judgment . . . . This is not to say that [the employer's] initial decision to conduct surveillance and its request for clarification from [the doctor] were unreasonable. The FMLA does not require an employer to ignore human nature and assume that each of its employees always tells the truth. Given the sudden manner in which the request for leave arose, the lack of specific information about the nature of the condition that required it, and [plaintiff's] healthy appearance and

behavior, [the manager's] suspicions were understandable. And the fact that the surveillance report revealed that [plaintiff] had engaged in activities while on leave that were inconsistent with the severe functional limitations set forth in [the doctor's] initial certification certainly justified further action on [the employer's] part. If neither [plaintiff] nor her physician had offered any explanation of the apparent inconsistency, [the employer's] decision to terminate [plaintiff's] employment would have been entirely justified.

*Id.* at *5. The court then further explained that, based upon the additional evidence offered by plaintiff to the employer to explain why the activities were not inconsistent with the limitations her doctor had placed upon her, "a jury could conclude that [the employer's] decision to terminate her employment was not based on an honest belief that she had abused her leave" and that the employer "simply saw an opportunity to get rid of an employee with a chronic mental illness whom it regarded as unreliable." *Id.* at 6.

Similarly, in *Weimer v. Honda of America Manufacturing, Inc.*, No. 2:06-CV-844, 2008 WL 2421648, at *6 (S.D. Ohio June 12, 2008), the court denied the employer's motion for summary judgment on FMLA claim, despite video of plaintiff installing a porch while on leave. Specifically, the Court noted:

> [T]he Court cannot say whether the work Plaintiff apparently performed on this porch demonstrated that he could perform the essential tasks of his job. He may or may not have been able to perform the vigorous work to a level that still fell short of the

demands of his job. If the latter is true, then Plaintiff may have indeed been using his FMLA leave for its intended purpose even while engaging in the less demanding activity of working on this porch.

*Id.* at *5. Thus, the court concluded that "if Defendant knew that Plaintiff's purported on-leave activities did not rise to the level of his job functions, then regardless of whether the investigation is mistaken or correct as to his on-leave activities, the investigation's conclusions cannot provide the honest belief on which Defendant relies." *Id.* at *6; *see also Smith v. Southern Ill. Riverboat/Casino Cruises, Inc.*, No. 06-cv-4069, 2007 WL 1805597, at *5 (S.D. Ill. June 21, 2007) (denying employer's motion for summary judgment on FMLA claim, despite surveillance evidence of plaintiff on vacation while on leave, because the fact that plaintiff "went on vacation does not, in itself, suggest that her limitations were such that she could work"). *See generally Moran v. Redford Union Sch. Dist.*, Civil Action No. 08-CV-15215, 2009 WL 5217681, at *14 (E.D. Mich. Dec. 29, 2009) (noting that "a jury could conclude that Plaintiff [by traveling to Florida] did not engage in any activities that are inconsistent with her medical leave" and distinguishing other cases where a plaintiff was "caught 'red-handed' performing activities while on their FMLA leave that were plainly inconsistent with their respective medical leaves" because, in such cases, "it would have been impossible for any jury to conclude, in light of the surveillance conducted by the respective private investigators, that the respective plaintiffs were not misusing their FMLA leave").

As in *Nelson* and *Weimer*, the videotaped surveillance evidence of plaintiff in the instant case is not necessarily of the "smoking gun" nature that defendant attempts to portray to the Court. A rational jury could, when viewing that videotape in light of the entire record, conclude that plaintiff was not able to work while on leave, notwithstanding his activities on the two days in the video. In fact, Dr. Abeles testified in his deposition that, notwithstanding the video, he now would reach a different conclusion regarding plaintiff's ability to work while on leave. Thus, reasonable minds can clearly disagree on the weight that should be given to that videotape. Moreover, if all of the other disputed factual issues in the record (and all reasonable inferences from the evidence) are resolved in plaintiff's favor, a rational jury may conclude that defendant's proffered reason regarding plaintiff's abuse of leave was not only erroneous, but that it was not honestly held and was pretextual.

In sum, although defendant has offered evidence to undermine plaintiff's FMLA claims in this lawsuit, there are sufficient issues of disputed fact, including credibility determinations that must be made, to require these claims to be decided by a jury. Thus, summary judgment in defendant's favor is unwarranted.

b. Plaintiff's Motion

Plaintiff cross-moves for summary judgment on the FMLA claims. However, the same disputed facts that preclude summary judgment in defendant's favor also require that plaintiff's motion be denied. In particular, construing the evidence most favorably to defendant, there is evidence—much of which is described above—from which a rational jury could find that plaintiff misrepresented his health status, and/or that Verizon honestly believed that

plaintiff misrepresented his health status, and that Verizon did not interfere with plaintiff's FMLA leave or retaliate against him by cutting his FMLA leave short and ultimately firing him. Accordingly, plaintiff's cross-motion for summary judgment is denied.

## B. Race Discrimination Claims

Plaintiff also asserts that Verizon discriminated against him on the basis of his race in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, *et seq*. and the New York State Human Rights Law ("NYSHRL"). Verizon has moved for summary judgement on this claim. As set forth below, plaintiff has failed to set forth evidence that raises a genuine issue of fact on the race discrimination claims, and, thus, summary judgment in defendant's favor on these claims is warranted.

Because plaintiff presents no direct evidence of discriminatory treatment based on his race, the *McDonnell-Douglas* standard described above is again applicable. To establish a prima facie case of discrimination under Title VII, a plaintiff must show "'(1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.'" *Sassaman v. Gamanche*, 566 F.3d 307, 312 (2d Cir. 2009) (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008)). The Second Circuit has characterized the evidence necessary for the plaintiff to satisfy this initial burden as "minimal" and "de minimis." *See Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).

Once plaintiff establishes a prima facie

case, the burden shifts to the defendant to "'articulate some legitimate, nondiscriminatory reason for the' termination." *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311 (1996)). If the defendant carries that burden, "the burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Patterson*, 375 F.3d at 221 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). "'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id*. (quoting *Burdine*, 450 U.S. at 253).

To meet this burden, the plaintiff may rely on evidence presented to establish her prima facie case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-101 (2003). It is not sufficient, however, for a plaintiff merely to show that she satisfies "*McDonnell Douglas*'s minimal requirements of a prima facie case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 153 (2d Cir. 2000). Instead, the key inquiry is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination. *See id*. at 153-54; *Connell v. Consol. Edison Co. of N.Y., Inc.*, 109 F. Supp. 2d 202, 207-08 (S.D.N.Y.

2000).[13]

Here, Casseus has provided no evidence from which a jury could infer racial discrimination, even if the jury rejected Verizon's proffered non-discriminatory reason for its actions. The complaint contains only a conclusory assertion that Casseus was terminated on the basis of race. (Compl. ¶ 68.) In his deposition, Casseus asserted that he believed racial discrimination occurred because he had sickle cell anemia and sickle cell anemia disproportionately affects African Americans. (*See* Pl.'s Dep. 243:3-9.) However, again, nothing in this assertion even remotely suggests that Verizon intentionally discriminated against plaintiff on the basis of race.

Now, in his opposition brief to Verizon's summary judgment motion, Casseus raises a new theory of Title VII liability—that Verizon "waited substantially longer to conduct surveillance on white people" than on Casseus. Plaintiff also provides examples of allegedly similarly situated white employees. (Pl.'s Opp. at 25-26.)

This new allegation does not enable Casseus's race discrimination claim to survive summary judgment. As a threshold matter, courts generally do not consider claims or completely new theories of liability asserted for the first time in opposition to summary judgment. *See, e.g.*, *Lyman v. CSX Transp., Inc.*, No. 09-2548-cv, 2010 WL 445613, at *2 (2d Cir. Feb. 8, 2010) (affirming district court's determination that it should not

consider claims raised for the first time in opposition to summary judgment (citing *Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006) and *Syracuse Broad. Corp. v. Newhouse*, 236 F.2d 522, 525 (2d Cir.1956))); *Brandon v. City of N.Y.*, - - - F. Supp. 2d - - -, No. 07 Civ. 8789 (LAP), 2010 WL 1375207, at *14 (S.D.N.Y. Mar. 30, 2010) ("It is black letter law that a party may not raise new claims for the first time in opposition to summary judgment."); *Heletsi v. Lufthansa German Airlines, Inc.*, No. 99CV4793(SJ), 2001 WL 1646518, at *1 n.1 (E.D.N.Y. Dec. 18, 2001) ("A party cannot amend their complaint simply by alleging new facts and theories in their memoranda opposing summary judgment."); *see also* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1183 n. 9 ("An opposition to a summary judgment motion is not the place for a plaintiff to raise new claims."). Accordingly, defendant is entitled to summary judgment on plaintiff's Title VII claim on this basis alone.

However, in any event, the Court also concludes that the race discrimination claims fail on the merits. Specifically, even considering the new allegations raised in plaintiff's opposition, plaintiff's Title VII claim would fail as a matter of law because he has not demonstrated an adverse employment action. "An adverse employment action is a 'materially adverse change in the terms and conditions of employment.'" *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (quoting *Sanders v. N.Y. City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004)). The surveillance, which occurred while plaintiff was on leave and which plaintiff was apparently unaware of until he returned to work, did not directly affect the terms and conditions of plaintiff's employment. Therefore, even considering plaintiff's new

---

[13] The same analysis applies to plaintiff's race discrimination claim under the New York State Human Rights Law. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n.1 (2d Cir. 2000).

theory of race discrimination, plaintiff has failed to establish a prima facie case.

In sum, given the complete lack of evidence from which a rational jury could find that the defendant's termination decision was motivated by race, the Court grants defendant's motion for summary judgment on plaintiff's race discrimination claims.

## C. Disability Discrimination Claims

Plaintiff also asserts disability claims under the ADA and the NYSHRL. As set forth below, plaintiff's own evidence demonstrates that the manifestations of his illness are episodic and not consistently severe. Thus, plaintiff's own evidence demonstrates that his impairment cannot, as a matter of law, constitute a disability within the meaning of the ADA under the particular circumstances of this case. However, plaintiff's evidence, if credited, would satisfy the broader definition of disability under the NYSHRL. Moreover, plaintiff has submitted sufficient evidence to create material issues of fact that survive summary judgment on the other elements of a disability discrimination claim under the NYSHRL. Thus, although the Court grants summary judgment on the ADA claim, it denies summary judgment on the NYSHRL claim.

### 1. ADA

Casseus brings claims under the ADA for both "failure to accommodate" (Compl. ¶ 57) and for discriminatory adverse employment action on the basis of his disability. (Compl. ¶¶ 56, 58.)

#### a. Applicable Law

The ADA prohibits discrimination against a "qualified individual on the basis of disability." 42 U.S.C. § 12112(a).[14] To

[14] Congress recently enacted the ADA Amendments Act of 2008 ("ADAAA"), effective January 1, 2009, which expanded the class of individuals entitled to protection under the ADA. However, this Court and other courts—including the Second Circuit in at least three summary orders—have indicated that the ADAAA does not apply to conduct that occurred prior to the effective date of the statute. *See, e.g., Ragusa v. Malverne Union Free Sch. Dist.*, No. 08-5367-2010 WL 2490966, at *1 n.2 (2d Cir. June 21, 2010) (summary order) ("[W]e here apply the version of the [ADA] in effect during the time period at issue, which ended with [plaintiff's] termination on June 30, 2005."); *Rogers v. City of N.Y.*, 359 F. App'x 201, 203 n.1 (2d Cir. 2009); *Cody v. County of Nassau*, 345 F. App'x 717, 720 (2d Cir. 2009) ("[I]t is unlikely that the ADA Amendments Act of 2008 . . . applies to conduct that occurred before the Act's effective date of January 1, 2009. We need not decide the retroactivity issue . . . ."); *Schroeder v. Suffolk County Cmty. Coll.*, No. 07-CV-2060 (JFB) (WDW), 2009 WL 1748869, at *6 (E.D.N.Y. June 22, 2009) (collecting cases); *see also White v. Sears, Roebuck & Co.*, No. 07 Civ. 4286 (NGG) (MDG), 2009 WL 1140434, at *5 (E.D.N.Y. Apr. 27, 2009) ("The court therefore . . . concludes that the [ADAAA] should not apply to this case. This is consistent with the conclusions of other courts in this circuit that the 2008 Amendments do not apply to conduct prior to the effective date of the amended statute." (collecting cases)); *Moran v. Premier Educ. Group, LP*, 599 F. Supp. 2d 263, 271-72 (D. Conn. 2009) ("[I]t appears that every court that has addressed this issue, which includes a number of federal district courts and at least one federal appeals court, has concluded that the 2008 Amendments cannot be applied retroactively to conduct that preceded its effective date." (collecting cases)). Thus, the Court will evaluate plaintiff's evidence within the legal framework in place at the time of plaintiff's termination, June 1, 2007, and not under the ADAAA.

succeed on an ADA claim, a plaintiff must prove that "'(1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of his disability or perceived disability.'" *Kinneary v. City of N.Y.*, 601 F.3d 151, 155-56 (2d Cir. 2010) (quoting *Capobianco v. City of N.Y.*, 422 F.3d 47, 56 (2d. Cir. 2005)).

"Discrimination under the ADA includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.'" *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008) (quoting 42 U.S.C. § 12112(b)(5)(A)).

In this case, plaintiff alleges that Verizon violated the ADA by (1) interfering with his leave and denying him leave because he was disabled; (2) failing to provide a reasonable accommodation after ordering him to return to work; and (3) firing him because he was disabled. (*See* Compl. ¶¶ 56-58.)

To succeed on any of his ADA theories of liability, plaintiff must demonstrate that he is an individual with a disability. The ADA defines "disability" as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).[15]

b. Application

Casseus argues that he falls within categories (A) and (B) of the above-referenced ADA definition of disability. As set forth below, the Court disagrees and concludes that the uncontroverted evidence demonstrates, as a matter of law, that plaintiff's impairment cannot meet the ADA definition of disability.

(1) Substantially Limited in a Major Life Activity

To determine whether an individual fits into the first category, i.e., that the individual has a physical or mental impairment that substantially limits a major life activity, the Second Circuit has "applied the three-step approach taken by the Supreme Court in *Bragdon v. Abbott*, 524 U.S. 624, 118 S. Ct. 2196, 141 L.Ed.2d 540 (1998)." *Weixel v. Board of Educ. of City of New York*, 287 F.3d 138, 147 (2d Cir. 2002). Under this approach,

plaintiff must first show that she suffers from a physical or mental impairment. Second, plaintiff must identify the activity claimed to be impaired and establish that it constitutes a "major life activity."

---

[15] Under the ADAAA, "disability" is now defined at 42 U.S.C. § 12102(1).

Third, the plaintiff must show that her impairment "substantially limits" the major life activity previously identified. In addition, the Supreme Court has recently clarified that the identified major life activity must be "of central importance to daily life. *Toyota Motor Mfg. v. Williams*, 534 U.S. 184 (2002).

*Weixel*, 287 F.3d at 147 (internal citations omitted).

Here, Verizon does not dispute that sickle cell anemia is a "physical impairment." Verizon does argue, however, that plaintiff has not shown that he is substantially limited in a major life activity.

The term "major life activity" includes "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). This, however, is not an exclusive list, and the Second Circuit has also included "'sitting, standing, lifting, and reaching'" as major life activities. *Ryan v. Grae & Rybicki*, 135 F.3d 867, 870 (2d Cir. 1998) (quoting U.S. Equal Employment Opportunity Commission, *Americans with Disabilities Act Handbook*, I-27 (1992)).[16]

Under applicable EEOC regulations, "[t]he following factors should be considered in determining whether someone is substantially

limited in a major life activity":

> (i) The nature and severity of the impairment;

> (ii) The duration or expected duration of the impairment; and

> (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2). Although these EEOC regulations do not bind courts, they do provide courts "with guidance" in interpreting the ADA. *See Ryan*, 135 F.3d at 870.

In any event, a plaintiff will not be "substantially limited" in a major life activity if the impairment in question causes only episodic or temporary restrictions. In *Ryan*, for example, the plaintiff suffered from ulcerative colitis of the rectum. A symptom of this condition, which was incurable, was that the plaintiff would periodically be constipated for three to four days and then have uncontrollable and painful diarrhea for another three to four days. After being fired by her employer, the plaintiff filed suit under the ADA. She argued, *inter alia*, that she was substantially limited in the major life activities of "control[ing] the elimination of waste" and caring for herself. The district court granted the employer summary judgment, and the Second Circuit affirmed, holding that the plaintiff had not shown she was substantially limited in a major life activity. 135 F.3d at 871-72. The court recognized that the plaintiff's colitis was a severe impairment when it was symptomatic and that it would affect the plaintiff for the rest of her life. However, the plaintiff acknowledged that she could go years without experiencing

---

[16] The ADAAA codifies all of these activities, except sitting and reaching, as "major life activities." Additionally, the ADAAA includes concentrating, reading, bending, eating, sleeping, thinking, communicating, and "major bodily functions" as major life activities. *See* 42 U.S.C. § 12102(2) (as amended Jan. 1, 2009).

symptoms of her colitis and that her colitis symptoms varied in intensity and generally occurred only in the summer months. Thus, the duration of the impairment and the expected long-term impact of the impairment weighed against finding that the plaintiff was substantially limited. Accordingly, the Second Circuit held that the plaintiff had not shown she was limited in the major life activities of "control[ing] the elimination of waste" and caring for herself. *Id.*

Since the Second Circuit decided *Ryan*, other courts have held that a plaintiff is not substantially limited in a major life activity because of a condition that causes intermittent restrictions on the person, even when those restrictions are severe. *See, e.g.*, *Waldrip v. Gen. Elec. Co.*, 325 F.3d 652, 656-57 (5th Cir. 2003) (finding that plaintiff had not shown that chronic pancreatitis, a "painful" condition that "can cause bleeding, pancreatic necrosis (tissue death), or even pancreatic cancer," substantially limited him in the major life activity of eating where doctor testified that "at most, he occasionally must miss a few days of work when his chronic pancreatitis flares up"); *EEOC v. Sara Lee, Inc.*, 237 F.3d 349, 352 (4th Cir. 2001) (explaining that "[t]o hold that a person is disabled whenever that individual suffers from an occasional manifestation of an illness would expand the contours of the ADA beyond all bounds" and finding that plaintiff who periodically experienced seizures caused by epilepsy was not substantially limited in major life activities of sleeping, thinking, or caring for herself); *Tojzan v. N.Y. Presbyterian Hosp.*, No. 00 Civ. 6105(WHP), 2003 WL 1738993, at *8 (S.D.N.Y. Mar. 31, 2003) ("Since [plaintiff's] physical impairments are episodic and are not consistently severe, they do not substantially limit a major life activity. Thus, [plaintiff] is not disabled within the meaning of the ADA

and consequently cannot establish a *prima facie* case of disability discrimination."); *Irby v. N.Y. City Transit Auth.*, No. 99 CIV. 2172(VM), 2000 WL 1634413, at *2 (S.D.N.Y. Oct. 30, 2000) (finding plaintiff who alleged that symptoms of polycystic kidney and polycystic liver disease caused her to miss work at least two to three days each month was not substantially limited in any major life activity), *aff'd*, 262 F.3d 412 (2d Cir. 2001).[17]

Similarly here, even viewing the facts in a light most favorable to Casseus, no reasonable jury could find that the ulcers and wounds caused by Casseus's sickle cell anemia substantially limit Casseus in any major life activity. According to the declaration of one of Casseus's physicians, Dr. Greta Rainsford, plaintiff's vascular crises can be severe and, at times, make it extremely painful to bend, drive, walk, or stand. (Rainsford Decl. ¶¶ 14, 17.) Not every vascular crisis experienced by plaintiff is this severe, however, and, even during a particular crisis, plaintiff's symptoms vary greatly in intensity. (*See id.* ¶¶ 17-18.) Moreover, Dr. Rainsford indicates that the crises are relatively infrequent and that plaintiff is able to function without substantial limitation most of the time:

---

[17] The Court notes that this requirement has been modified by the enactment of the ADAAA. In particular, the ADAAA expressly provides that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D). However, as noted above, the ADAAA does not have retroactive effect, and the version of the ADA in existence when Verizon fired plaintiff did not include this language. Thus, the new ADAAA standard is inapplicable to this case.

From 2000 to 2006, Paul had two instances where deep ulcers and wounds developed on his ankles. The crises usually come about when the ulcers and wounds manifest[ed] themselves. During this time period, when Paul did not have ulcers and wounds, he could for the most part perform activities of daily living which included working at Verizon.

(*Id*. ¶ 19.) Thus, like the plaintiff in *Ryan*, although Casseus's sickle cell anemia is apparently permanent, "it is asymptomatic for long periods," its symptoms "var[y] in intensity," and Casseus "can go for years without significant symptoms." 135 F.3d at 871. Accordingly, although the vascular crises resulting from sickle cell anemia may, at times, limit Casseus's ability to, among other things, work and walk, no reasonable jury could find that Casseus is substantially limited in any major life activity as defined under the ADA.

### (2) Record of Such an Impairment

The Court also concludes that Casseus cannot, as a matter of law, show that he has a "record of" a disability. To establish that he fits within this prong of the definition of disability, Casseus must show that Verizon had a record of him as having "an impairment that would substantially limit one or more of [his] major life activities.'" *McCowan v. HSBC Bank*, 689 F. Supp. 2d 390, 405 (E.D.N.Y 2010). Here, although there is evidence in the record that Verizon knew that Cassseus had sickle cell anemia, there is no evidence from which a jury could find that Verizon had a record indicating that Casseus was substantially limited in any major life

activity for the reasons discussed *supra*.[18]

---

[18] Verizon apparently lost plaintiff's personnel file when the office where plaintiff worked was relocated to Great River, NY. (*See* Pl.'s Reply Mem. of Law Ex. A.) Plaintiff argues that, because Verizon lost the personnel file, an adverse inference should arise and establish that he has a record of disability. (*See* Pl.'s Reply Mem. of Law at 6-7.) The Court disagrees. It is true that "[i]n borderline cases, an inference of spoliation, in combination with 'some (not insubstantial) evidence' for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001) (quoting *Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir.1998)). A spoliation inference is available if: (1) relevant evidence is destroyed; (2) with culpability; (3) when the defendant was under a duty to preserve the evidence. *See id.* at 108-09. Even if the Court considered this argument, which is raised for the first time in plaintiff's reply memorandum of law and not in a separate motion, plaintiff would not survive (or be entitled to) summary judgment. First, plaintiff cannot show that the personnel file was relevant to his "record of" disability theory and, thus, even assuming Verizon violated a duty to preserve plaintiff's personnel file and destroyed the personnel file with culpability, plaintiff cannot meet the requirements for an inference of spoliation. "Relevant" in this context "'means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence. Rather, the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction.'" *Scalera v. Electrograph Sys., Inc.*, 262 F.R.D. 162, 178 (E.D.N.Y. 2009) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108-09 (2d Cir. 2002). Relevance may be established by (1) a showing that the party responsible for the evidence's destruction acted with a sufficiently culpable state

of mind or (2) extrinsic evidence showing that the missing evidence would have been favorable to the moving party. *See id.* Here, Casseus has not presented any extrinsic evidence to support an argument that Verizon had a record that Casseus was disabled, and the Court will not infer otherwise. As explained above, statements from Casseus himself and the physician who has treated him for over 30 years establish that Casseus is not an individual with a disability under the ADA. Thus, there is simply no basis to believe that Casseus's personnel file contained some record that Casseus was disabled when his testimony and his doctor's affidavit demonstrate that he is not disabled. Second, even if Casseus did meet the requirements for an adverse spoliation inference, he has not made the additional further showing of "(not insubstantial) evidence" to survive summary judgment. *See Byrnie*, 243 F.3d at 107. Again, there is no basis to infer that Verizon had a record of Casseus being disabled. As such, even if Casseus established spoliation, his "record of" disability theory would not survive summary judgment. *Spiegel v. Adirondack Park Agency*, 662 F. Supp. 2d 243, 257 (N.D.N.Y. 2009) ("Even were the elements of spoliation satisfied, the sanction of permitting the [plaintiffs] to survive summary judgment on the element of malice in their selective prosecution claim would be inappropriate . . . [because t]he evidence of malice is insubstantial at best."); *Liburd v. Bronx Lebanon Hosp. Ctr.*, No. 07 Civ. 11316 (HB), 2009 WL 900739, *7 (S.D.N.Y. Apr. 3, 2009) (finding that plaintiff's spoliation claim was "insufficient to save her from summary judgment" because plaintiff had "produced no evidence whatsoever" that destroyed records were favorable to her); *Hamilton v. Mount Sinai Hosp.*, 528 F. Supp. 2d 431, 445 (S.D.N.Y. 2007) ("'[T]he destruction of evidence, standing alone, is [not] enough to allow a party who has produced no evidence—or utterly inadequate evidence—in support of a given claim to survive summary judgment on that claim.'" (quoting *Kronisch*, 150 F.3d at 128 (second alteration in original))).

Therefore, no reasonable jury could find that Casseus was an "individual with a disability." As such, he has failed to establish a prima facie case on any of his ADA theories. Therefore, Verizon is entitled to summary judgment on those claims, and Casseus's motion for summary judgment on the ADA claims is denied.[19]

### 2. NYSHRL

The definition of "disability" is broader under the NYSHRL than it is under the ADA. *See State Div. of Human Rights v. Xerox Corp.*, 480 N.E.2d 695, 698 (N.Y. 1985); *Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144, 155 (2d Cir. 1998) ("Regardless of the [fact that the] legislative history of the [NYSHRL indicates] that the statutory definition of disability was intended to be coextensive with that of the federal disability statutes, we are bound by the construction of the statute propounded by the state's highest court."). Under New York law, the term "disability" is not limited to physical or mental impairments but "may also include 'medical' impairments. In addition, to qualify as a disability, the condition may manifest itself in one of two ways: (1) by preventing the exercise of a normal bodily function or (2) by being demonstrable by medically accepted clinical or laboratory diagnostic techniques."

[19] The Court's determination that Casseus does not have a "disability" as defined under the ADA does not affect the issue of whether Casseus had a "serious health condition" so as to qualify for FMLA leave. *See* 29 C.F.R. § 825.702(b) (stating the "ADA's 'disability' and FMLA's 'serious health condition' are different concepts, and must be analyzed separately").

*Xerox Corp.*, 480 N.E.2d at 698 (internal quotation omitted); *see also* N.Y. Exec. Law § 292(21) ("The term 'disability' means . . . a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques . . . ."). Thus, under state law, a disability need only be a demonstrable impairment; it does not have to substantially limit a major life activity. *See Reeves*, 140 F.3d at 154; *see, e.g., Krikelis v. Vassar Coll.*, 581 F. Supp. 2d 476, 486 (S.D.N.Y. 2008) (finding that employee who suffered from diabetes was not substantially limited in a major life activity under the ADA but that triable issues of fact existed as to whether plaintiff had a cognizable disability under the NYSHRL).

Neither party directly addresses the applicability of the NYSHRL's definition of a disability here. Nonetheless, a reasonable jury could determine that plaintiff's sickle cell anemia and associated vascular crises are a physical or medical impairment and, as such, are a "disability" under New York law.

Additionally, construing the evidence most favorably to plaintiff, a rational jury could find that plaintiff has established the other elements of a disability discrimination claim under the NYSHRL. Unlike the analysis for the "disability" element, the analysis for these other elements is identical to the analysis under the ADA. *Primmer v. CBS Studios, Inc.*, 667 F. Supp. 2d 248, 261 (S.D.N.Y. 2009) ("The only major difference in the analysis of disability discrimination under the state and city statutes as compared to the ADA is that the definition of disability under the former is considerably broader than the ADA

definition, at least before the amendments of 2008."); *see also, e.g., Krikelis*, 581 F. Supp. 2d at 486 ("The NYHRL 'reasonable accommodation' requirement parallels that imposed by the ADA, and so the Court appropriately looks to the latter for guidance." (citing *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 n. 3 (2d Cir. 2001))).

Here, plaintiff has submitted evidence that raises a genuine issue of fact as to whether plaintiff should have been given an accommodation of additional leave in late January 2007 to allow his wounds to heal. *Cf. Phillips v. City of N.Y.*, 884 N.Y.S.2d 369, 375-76 (App. Div. 2009) (finding that one-year additional leave could be reasonable accommodation given circumstances of case). As defendant has correctly noted, plaintiff apparently did not expressly request an accommodation upon his return to work. However, the Second Circuit has held, in an ADA case, that while it is generally the employee's responsibility to request an accommodation, "an employer has a duty [to] reasonably . . . accommodate an employee's disability if the disability is obvious-which is to say, if the employer knew or reasonably should have known that the employee was disabled." *Brady v. Walmart Stores*, 531 F.3d 127, 135 (2d Cir. 2008). In such cases, the employer's duty is to engage in an "interactive process" with the employee to determine if the employee can be reasonably accommodated. *Id*. at 135-36. Viewed in a light most favorable to plaintiff, there is evidence that Verizon should have known that Casseus was still suffering from the effects of his vascular crisis when he returned to work in late January 2007 but that Verizon nonetheless failed to engage in the required interactive process. Additionally, plaintiff suffered an adverse employment action, specifically his termination, following his return to work. As

discussed in the context of the FMLA claims, when the evidence is construed most favorably to plaintiff, there is evidence that his termination occurred because his medical impairment required him to miss work.[20]

Although Verizon has proffered a non-discriminatory reason for plaintiff's termination, a rational jury could, for the reasons discussed in analyzing the FMLA claims, reject Verizon's proffered reason as pretext and conclude that plaintiff was terminated based upon a disability within the meaning of the NYSHRL. Moreover, a rational jury could also reject plaintiff's evidence and credit the proffered explanation of Verizon for its employment decision. As such, triable issues of fact exist with respect to plaintiff's NYSHRL disability claim, and the Court denies the cross-motions for summary judgment on that claim.

## IV. CONCLUSION

For the foregoing reasons, the Court grants defendant's motion for summary judgment in part and denies it in part. Specifically, the Court grants summary judgment on the race discrimination claims under federal and state law and on the ADA claim. The Court denies summary judgment on the FMLA claims and the NYSHRL disability claim. Finally, the Court denies plaintiff's cross-motion for summary judgment in its entirety. The parties shall participate in a telephone conference on Tuesday, July 20, 2010 at 10:00 a.m. to schedule a trial date on the remaining claims. At that time, counsel for defendant shall initiate the call and, once all parties are on the line, contact Chambers at (631) 712 5670.

---

[20] Verizon also argues that plaintiff cannot establish a prima facie case of disability discrimination because Henke ultimately decided to fire plaintiff but was unaware plaintiff suffered from sickle cell anemia. However, John Scuteri testified that the decision to fire plaintiff "was a collaborative one, if you will . . . [and that] . . .[i]t originated with labor." (Scuteri Dep. 52:20-23.) Labor knew that plaintiff had sickle cell anemia and that he had wounds on his ankles. (*See* Melo-Papadakis Dep. 27:23-28:2, 62:18-63:5.) Thus, triable issues of fact exist as to who the relevant decisionmakers were and what they knew. Additionally, "under the so-called 'cat's paw' theory of liability, 'the impermissible bias of a single individual can infect the entire group of collective decisionmakers,' . . . at least when the decisionmakers are overly deferential to the biased individual's recommendations." *Baron v. N.Y. City Dep't of Educ.*, No. 06-CV-2816 (FB)(MDG), 2009 WL 1938975, at *6 (E.D.N.Y. 2009) (citing *Fullard v. City of N.Y.*, 274 F. Supp. 2d 347, 357 (S.D.N.Y. 2003) and quoting *Jamieson v. Poughkeepsie City Sch. Dist.*, 195 F. Supp. 2d 457, 474 (S.D.N.Y. 2002) (internal quotation omitted)); *see Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999) ("We recognize that the impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision in violation of Title VII. This is true even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the promotion process." (internal citation omitted)); *see also Sadki v. SUNY Coll. at Brockport*, 310 F. Supp. 2d 506, 515 n.5 (W.D.N.Y. 2004) (endorsing the cat's paw theory of employer liability for discrimination and noting that "[c]ertainly it

---

would not be surprising if a university president gives great deference to a dean's recommendations for faculty positions, and the manner in which [the president] endorsed [the dean's] recommendation—'I agree with your analysis. PY'—suggests that [the president] did so here.").

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: July 9, 2010
Central Islip, New York

* * *

Plaintiff is represented by Justin H. Reilly and
Neil H. Greenberg, Law Offices of Neil H.
Greenberg & Associates, 900 Merchants
Concourse, Suite 314, Westbury, NY 11590.
Defendant is represented by Martin Warren
Aron of Edwards Angell Palmer & Dodge
LLP, 1 Giralda Farms, Madison, NJ 07940.